UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EDWARD LEE

    Plaintiff,

    v.

STYROLUTION AMERICA LLC

    Defendant.

No. 12 CV 934

Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Plaintiff Edward Lee brings this two-count Complaint against his former employer, Defendant Styrolution America LLC ("Styrolution"), under 42 U.S.C. § 1981. Plaintiff, who is African American, claims that he suffered a racially hostile work environment at Styrolution and was terminated in retaliation for complaints he made to his supervisors about the hostile work environment. Defendant has moved for summary judgment. For the following reasons, Defendant's motion is GRANTED.

    I.    FACTS

Defendant Styrolution is a chemical company that produces styrenics, a compound used in various household and industrial products. In July 2009, Plaintiff began working for Styrolution at its Channahon, Illinois chemical facility as a temporary warehouseman through Manpower temporary agency. On October 15, 2009, Plaintiff accepted an offer from Defendant to work as a regular employee in a logistics operator position, in which he was responsible for maintaining Defendant's rail yard and warehouse, as well as loading and unloading trucks. Plaintiff started working as a logistics operator in November 2009 and remained in that position

until he was terminated on or about May 1, 2011. During this time, Plaintiff was the only African American logistics operator employed by Defendant.

A.	Hostile Work Environment

Plaintiff alleges he was subject to racial harassment by supervisors and co-workers during the course of his employment. The first occurrences of such treatment took place between July and November 2009, while Plaintiff was working as a temporary employee. During this period, a Caucasian co-worker, Scott Boundy, repeatedly called Plaintiff "boy." Plaintiff believed that Boundy's use of the term "boy" was racially derogatory and harkened back to "the sixties and the fifties." (Pl. Dep. 92:17-22). At his deposition, Plaintiff gave examples of the "boy" remarks, which included Boundy saying "[Plaintiff] ain't no man . . . he ain't nothing but a boy to me," and "What's up, boy?" (Pl. Dep. 92:8-13, 92:23-93:4, 220:21-24). Plaintiff complained about Boundy's remarks to his supervisor, Bob Elliott ("Elliott"). Elliott laughed at Plaintiff, told him "[t]hat's the way [Boundy] is." The record is unclear whether Elliott took any corrective action.

Plaintiff also reported Boundy's "boy" comments to Marcia Nicol, head of the Human Resources Department, when she called Plaintiff to her office to investigate claims that Plaintiff was threatening to "kick Scott Boundy's butt" for "disrespecting [Plaintiff] and calling [him] boy." (Pl. Dep. 89:11-17). It is not clear from the record whether Nicol took any corrective action. Boundy ceased referring to Plaintiff as "boy" in November 2009. (Def. SOF ¶ 14).

When Plaintiff began working as a regular employee for Styrolution in November 2009, Boundy was assigned to be his trainer. Plaintiff alleges that Boundy failed to train him properly and instead "treat[ed] me like I was his servant." (Pl. Dep. 109:14-15). Specifically, Plaintiff alleges that Boundy assigned Plaintiff extra work that Boundy did not want to do himself, asked

2

Plaintiff to perform unreasonably difficult tasks and work unreasonably long hours, gave Plaintiff instructions in an aggressive manner, and falsified Plaintiff's training records. Plaintiff complained to Elliott and another supervisor, Chris Ohrt, about the problems he was having with Boundy. The two men told Plaintff, "that's the way [Boundy] is. Just go ahead and do the training." (Pl. Dep. 49:1-7). Chris Ohrt also told Plaintiff to "grow tougher skin" and to "just go back to work." (Pl. Dep. 48:16-24).

Unsatisfied with his supervisors' response, Plaintiff, on March 22, 2010, emailed his unit coordinator, Thad Zdunich ("Zdunich"), about the problems he was having with Boundy. Zdunich responded, "the faster you get done with training, the faster you won't have to deal with Boundy." (Pl. Dep. 215:15-216:16). It is not clear from the record whether Zdunich took any corrective action in response to the email. The following day, Elliott and Chris Ohrt told Plaintiff that they didn't appreciate him going over their head, and for Plaintiff to come to them first the next time he had a problem with Boundy. (Pl. Dep. 49:16-20).

Plaintiff alleges several other incidents that he says contributed to a racially hostile working environment, including the following:

1. One day Plaintiff killed a spider at work. His co-worker, Susan Hanson ("Hanson"), told Plaintiff that spiders were her friends, and said that if Plaintiff killed another spider she would take him out back to hang and beat him. (Pl. Dep. 243:11-18). Plaintiff interpreted this as a racially charged remark that alluded, essentially, to lynch mobs. Plaintiff complained about the incident to his supervisor at the time, Jim Paulson ("Paulson"). It is unclear from the record whether Paulson took any corrective action. In July 2010, Plaintiff also complained about the incident to Marcia Nicol, head of the Human Resources Division. It is not clear from the record whether Nicol took any corrective

3

action. Plaintiff also claims Hanson once threatened to kick him in the testicles. (Pl. Dep. 245:14-16). He also heard a rumor that Hanson threatened "to kick Bob Elliott in the testicles if [Elliott] followed her around." (Pl. Dep. 245:17-23). Plaintiff describes Hanson as "a little hostile individual." (Pl. Dep. 246:3-4).

2. While Plaintiff was still a temporary employee, Nathan Sellars ("Sellars"), a Relief Operator[1] at Styrolution, wrote "Go-Fer Red" on the back of Plaintiff's helmet. (Pl. Dep. 52:9-11).[2]

3. Shortly after Plaintiff was hired on, Boundy put a sticker on the back of Plaintiff's helmet that said "universal waste." *Id.*

4. At some point, Sellars allegedly told co-worker Matt Ohrt that Plaintiff was a "thug and a pimp and a player," when Sellars heard that Matt Ohrt was trying to set up a date between Plaintiff and Matt Ohrt's sister (who was Sellars's sister-in-law and Chris Ohrt's daughter). (Pl. Dep. 232:4-233:24). Plaintiff himself did not hear Sellars make the comment, but was told about it by Matt Ohrt. Later, while in a conference room alone with Chris Ohrt, Ohrt said to Plaintiff "[y]ou're getting yourself into something you're not going to be able to get out of." (Pl. Dep. 307:2-17). Plaintiff interpreted this as a reference to Plaintiff's interactions with his daughter.

5. At some point, someone wrote on a whiteboard "I wonder if raccoons eat red meat." (Pl. Dep. 240:6-9). Plaintiff interpreted this comment as harassment directed at him because he had had several "real bad close encounters with raccoons" on the job, and because

---

[1] Defendant describes Relief Operators as "certain front-line employees . . . who substitute in some respects for supervisors who may be absent; Relief Operators do not have the authority to fire or to impose or recommend discipline, but they help ensure that production continues during a supervisor's absence." Def. SOF ¶ 5.
[2] "Red" is a nickname that Plaintiff has had since childhood. According to Plaintiff, it derives from his red hair and the fact that red is his favorite color. (Pl. Dep. 5:2-7). Plaintiff testified that he likes the nickname and is not offended by it. *Id.*

4

"raccoon" is sometimes used as a racial epithet against African Americans. (Pl. Dep. 240:16-20).

6. At some point, Plaintiff, while working in the cleaning shed, came across a railroad spike with "Red" written on it in black marker. Plaintiff interpreted this both as a physical threat and an offensive reference to slavery. (Pl. Dep. 258:1-20). There is no direct evidence that Plaintiff reported this incident to a supervisor.

7. At some point, Plaintiff came across a dust-covered bin in a warehouse on which someone had written "Red" in the dust. Plaintiff was scared by this, because it suggested that to him that "[e]ven when I'm off working, people are still thinking about me." (Pl. Dep. 259:15—260:18). Plaintiff did not report this incident to a supervisor because he felt he did not have their support and doing so would be like "shooting [himself] in the foot." (Pl. Dep. 260:7-18).

8. At some point, Plaintiff, for personal reasons, printed out a lengthy automotive manual on a work printer. Relief Operator John Bowlin became upset with Plaintiff, ostensibly because Bowlin needed to have access to the printer during this time. Bowlin "got in [Plaintiff's] face," and yelled at him, telling Plaintiff he was "sick and tired of looking at him". (Pl. Dep. 162:17-163:11).

9. At some point, co-worker Larry Lawless walked up to Plaintiff and said, "Red, are you ever going to amount to anything in life?", then laughed and walked away. (Pl. Dep. 225:13-226:1). Plaintiff complained about the incident to Chris Ohrt, who laughed and stated "That guy, he's all right. He don't mean nothing by it." (Pl. Dep. 226:2-6).

10. At some point, co-workers were spreading rumors that Plaintiff was sleeping in the locomotive cabs during his breaks. (Pl. Dep. 159:16-160:8).

11. Over the weekend shift from April 30 to May 1, 2011, Plaintiff alleges that Relief Operators Bowlin and Greg Wermer did not treat him fairly, were "aggressive" and "always trying to intimidate" him, and generally behaved in a way that embarrassed Plaintiff. (Def. Ex. I.). As an example, Plaintiff claims that "two anonymous sources" told him that Wermer had told the sources to monitor the parking lot for Plaintiff's arrival.

    B.    <u>Plaintiff's Tardiness and Absenteeism Problems</u>

Plaintiff had recurring instances of absenteeism when he worked for Defendant. (Def. SOF ¶ 41). He was absent from work without approval on July 9, 11 and 20, 2010. Defendant claims he was also absent from work on March 9, 27 and 28, and May 17, 2010. Plaintiff claims his absences on March 9, 27 and 28, and May 17, 2010 were approved sick days that were wrongly counted as absences. (Pl. Resp. to Def. SOF ¶ 41). Plaintiff's string of absences in July 2010 resulted in Plaintiff being presented with a documented verbal warning, written warning and final written warning on the same date, July 23, 2010. The final written warning, however, was not formally issued to Plaintiff until August 12, 2010. Defendant claims this is because Nicol felt that "it was not a best practice to escalate Plaintiff all the way to the final written warning on one day, and she wanted Styrolution to give Plaintiff some time in between the warning for him to improve." (Pl. Resp. to Def. SOF ¶ 43). Plaintiff disputes that Defendant delayed issuance of the warning to give Plaintiff an opportunity to improve. Instead, Plaintiff argues it was done to avoid problems with Defendant's legal department. In Plaintiff's Performance and Development Review ("PDR") signed on September 3, 2010, he was told that he needed to show immediate improvement in the area of absenteeism. Plaintiff received a

second final written warning for attendance on February 18, 2011, for an absence on January 3, 2011. (Pl. Resp. to Def. SOF ¶ 50).

Plaintiff also had tardiness problems. On March 1, 2011, Plaintiff received a documented verbal warning for tardiness on December 23, 2010, January 11, 2011, and February 10, 2011. Plaintiff disputes that he was late to work on December 23, 2010. (Pl. Resp. to Def. SOF ¶ 50). On March 3, 2011, Plaintiff received a final written warning based on tardiness on February 23, 2011 and March 1, 2011. Plaintiff contests both of these instances. He claims that the February 23 tardy was given for a safety meeting that he was never notified about, and the March 1 tardy was due to his being stuck in Alabama due to weather on his return from a funeral for which he provided documentation. (Pl. Resp. to Def. SOF ¶ 52). At the time the final warning for tardiness was issued, Zdunich told Plaintiff that next time Plaintiff was even two seconds late, he would be "fired on the spot." (Pl. Dep. 26:19-23). Plaintiff was subsequently tardy on April 16, 2011, and his supervisor had to call him to see where he was. (Pl. Resp. to Def. SOF ¶ 57).

C. Plaintiff's Termination

On April 21, 2011, Nicol sent an e-mail to Bentley Woudstra, Vice-President, Human Resources, informing him that Gerard Sabo, the Site Manager, and she were going to recommend to Defendant's legal department that Plaintiff be terminated based on attendance problems and tardiness. (Ex. 2 to Nicol Decl.). Woudstra concurred with the decision, stating that the case for terminating Plaintiff (and one other employee with excessive absences) was "very clear." Nicol was given approval to terminate Plaintiff's employment on April 22, 2011. Defendant claims that, due to the time it took to prepare the paper work and Plaintiff's own work schedule, a determination was made to communicate Plaintiff's termination to him on the morning of May 2, 2011. (Nicol Decl. at ¶¶ 11-14).

7

On May 1, 2011, Plaintiff send Nicol and Greg Mikut an email complaining about the way that Relief Operators Bowlin and Greg Wermer had treated him during the weekend shift. Nicol called Plaintiff later that day and instructed him to not report to work that evening because he was being terminated based on his April 16, 2011 tardy. (Pl. Resp. to Def. SOF ¶ 69).

II. ANALYSIS

Under Rule 56 of the Federal Rules of Civil Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A summary judgment motion is appropriately granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine issue of material fact exists, I must "construe all facts in the light most favorable to the nonmoving party and draw all reasonable and justifiable inference in favor of that party." *Myers v. Hasara*, 226 F.3d 821, 825 (7th Cir. 2000). In other words, to survive summary judgment the non-movant "must be able to show that a reasonable jury could return a verdict in its favor—metaphysical doubt as to the material facts does not create a genuine issue for trial." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 647 (7th Cir. 2011).

A. <u>Hostile Work Environment</u>

In Count I, Plaintiff alleges that he was subject to a racially hostile work environment. In order to make out a *prima facie* case of harassment that rises to a statutory violation under 42 U.S.C. § 1981 or Title VII, the Plaintiff must demonstrate: 1) that his work environment was both objectively and subjectively offensive; 2) the harassment was based on his race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work

8

environment by creating a hostile or abusive situation[3]; and (4) there is basis for employer liability. *Vance v. Ball State University*, 646 F.3d 461, 469 (7th Cir. 2011).

To determine whether the harassment in this case created an environment that was sufficiently "hostile" or "abusive" to trigger the protections of 42 U.S.C. § 1981, I must consider the totality of the circumstances. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22-23 (1993). As the Supreme Court has explained, "Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (internal quotations and citations omitted). Under this standard, the complained of conduct need not be so severe as to "cause a tangible psychological injury" before it is actionable, but it must rise above conduct that is "merely offensive." *Harris v. Forklift Systems*, 510 U.S. 17, 22 (1993).

Defendant does not deny that any of the alleged conduct took place. Instead, it argues Plaintiff cannot show that it was 1) based on his race; 2) severe or pervasive enough to trigger the protections of the federal antidiscrimination laws; or 3) there is a basis for employer liability. Viewing all evidence in the light most favorable to Plaintiff, and considering the totality of the circumstances surrounding this case, the Court finds that Plaintiff has failed to make a *prima facie* showing of a hostile working environment.

There are four fatal flaws to Plaintiff's case. First, his deposition testimony, which makes up virtually his entire case, is woefully vague. Plaintiff has not attempted to establish a

---

[3] The third element of the *prima facie* case is disjunctive—the conduct must be either severe or pervasive, not necessarily both. *Vance*, 646 F.3d at 469.

9

clear timeline for the court, or give detail to substantiate his allegations. For example, Plaintiff testified that Boundy would call him "boy" every day, but in the same breath this is modified to "maybe twice a week." (Pl. Dep. 95:6-10). What we know for sure is that Boundy stopped doing it in November 2009 when Plaintiff started as a regular employee. Similarly, Plaintiff claims that some of the Relief Operators, including John Bowlin and Greg Wermer were "intimidating" but he gives very few details about the specific way these two men treated him. The examples he does give (Bowlin yelling at Plaintiff for using the printer, Wermer standing behind him while Plaintiff used the computer) appear to be isolated incidents that were not particularly severe.

Finally, Plaintiff complains that Scott Boundy did not train him properly and "treated [Plaintiff] like his servant." (Pl. Dep. 109: 13-17). But the examples we are given are hazy— "like he would have me do things that he didn't want me to do…He wouldn't explain to me the purpose of doing it, why I wanted to do it" (Pl. Dep. 109:13-20); "He used to always try to find something else for me to do, or he'd find an excuse to tell the supervisor, and then they'd wind up having me go do warehouse duties" (Pl. Dep. 110:4-7); "Scott Boundy tried to make me do logistics work so he could go home" (Pl. Dep. 11:21-23)—and paint a picture of a lazy supervisor, perhaps, but not racial harassment. Viewing all facts in the light most favorable to him, and considering the totality of the circumstances, Plaintiff's deposition conveys nothing more than isolated instances of rude, aggressive, and at times offensive comments and conduct spread out over a 22 month period. I have no doubt it was unpleasant, but it does not amount to severe or pervasive harassment.

Second, Plaintiff has not made an adequate showing that any harassment he suffered was based on race. There is no evidence that he was ever the target of "any racial slurs, epithets, or other overtly race-related behavior." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir.

2004). Instead, Plaintiff alleges a series of statements by co-workers in which racial animus may be inferred. But Plaintiff has not presented, and the Court is unable to find, any case in which a hostile work environment claim has been sustained at summary judgment absent *some* overt racial conduct. To the contrary, even isolated use of the most odious racial epithets is typically inadequate to establish a hostile working environment claim. *See Sanders v. Village of Dixmoor, Ill.*, 178 F.3d 869 (7th Cir. 1999); *Meritor Sav. Bank, FSB v. Vinson.*, 477 U.S. 57, 67 (1986) ("mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not affect the conditions of employment to a sufficiently significant degree to [establish hostile work environment]") (internal citation omitted).

There is no doubt that Boundy's use of the term "boy" had obvious racial overtones, particularly since there is evidence that Boundy is Plaintiff's peer (if not junior). (Pl. Dep. 94:6-9). *See Ash v. Tyson Foods, Inc*, 546 U.S. 454, 456 (2006) (whether calling someone "boy" is a reflection of racial animus turns on "various factors, including context, inflection, tone of voice, local custom, and historical usage"). The Court does not mean to downplay the offensiveness of Boundy's remarks, but they are not severe or pervasive enough, standing alone, to create a hostile working environment.

As for the remaining comments, the Court is less persuaded of the racial connection. Hanson's threat to "beat and hang" Plaintiff if he killed another spider could be interpreted as a racially charged remark, but Plaintiff offers no other evidence to support the inference other than his personal feelings. There is, however, evidence that Hanson made exaggerated threats to white and black employees alike, which tends to undercut the inference that she was singling Plaintiff out based on race. As for the "I wonder if raccoons eat red meat" comment, no reasonable jury could find that objectively offensive in light of Plaintiff's own testimony about

11

his actual run-ins with raccoons at work (Pl. Dep. 240:16-20), and the fact that, by a plain reading of the statement, it is clear that Plaintiff was not being called a "raccoon."

Third, Plaintiff has not made an adequate showing of employer liability. In order for Plaintiff to make a prima facie showing of employer liability, he must demonstrate "(1) that a supervisor participated in the harassment that created the hostile work environment or (2) that [the employer] was negligent in discovering or remedying harassment by his coworkers." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 390 (7th Cir. 2010).[4] As a threshold matter, I find that there is inadequate evidence of supervisor participation in the alleged harassment to hold Defendant strictly liable, so Plaintiff must demonstrate negligence. To make the negligence showing, Plaintiff must show that "he made a concerted effort to inform [Defendant] of the racial harassment he was allegedly experiencing or that the harassment was sufficiently obvious to put [Defendant] on constructive notice." *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 391 (7th Cir. 2010).

Plaintiff cannot demonstrate that he made a concerted effort to inform Defendant of racial harassment. For one thing, there is no evidence that Plaintiff ever complained to supervisors about most of the alleged conduct, including the railroad spike inscribed with "Red," the "Go-fer Red" marking or the "Universal Waste" sticker on his helmet, Sellars's "thug, pimp, and player" comment, and the dust-covered bin with "Red" written on it. This is significant because it frustrates his ability to make a *prima facie* showing on a low-severity but pervasive harassment

---

[4] The scope of supervisory liability in racial harassment cases is currently before the Supreme Court, *Vance v. Ball State* University, __ U.S. __, 133 S.Ct. 23 (June 25, 2012) (granting certiorari). The outcome is relevant to this case because it could make Defendant strictly liable for the acts of its Relief Operators and possibly even Boundy during the time he was training Plaintiff. But due to the vague and uncompelling nature of the claims surrounding these actors, which I detail above, I find that Plaintiff would need to make a negligence showing even if the Supreme Court ends up broadening the scope of supervisory liability.

theory—there is no evidence that Defendant even knew about the majority of conduct of which Plaintiff complains.

Further, when Plaintiff did complain, he did not make it clear that he was complaining about *racial* harassment.[5] Plaintiff's deposition is muddled as to what he told supervisors in past conversations and he points to no documentary evidence to show he made explicit complaints about racial harassment. To the contrary, there is evidence that Plaintiff deliberately avoided making race-based allegations to supervisors: "[H]onestly I didn't say right out, like blurt out, 'It's because I'm black," or this or that . . . because I didn't want to just—folks just think, oh, he's trying to use the racist thing." (Pl. Dep. 22:17-23:7); "I didn't come out and say—I definitely was throwing the hint." (Pl. Dep. 227:16-17). "Vague complaints unrelated to racial hostility are insufficient to establish employer liability." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 550 (7th Cir. 2011).[6]

Fourth, Plaintiff's claims are significantly undermined by the fact that he admits to having problems with tardiness and absenteeism. *See generally Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998). It is not possible to conclude, for example, that Greg

---

[5] There is one possible exception to this. Plaintiff testified at his deposition that he told Nicol in July 2010 that he thought Scott Boundy was racist (Pl. Dep. 181:1-4). But by this time Boundy had stopped calling Plaintiff "boy" and was no longer training him. So, assuming Plaintiff is remembering correctly, he cannot show that Nicol was negligent in failing to remedy Boundy's harassment.

[6] It appears that Plaintiff complained to co-workers about racial harassment, and second hand accounts of this may have trickled up to management. In July 2010, Nicol called Plaintiff to her office to investigate claims that he was telling co-workers that he felt "everyone here is racist." Nicol testified that when she asked Plaintiff about the comment at this meeting, he denied having ever said it. (Nicol Dep. 33:10-13; 97:12-19). Plaintiff disputes this, and says that he told Nicol at the July 2010 meeting that "the place is racist, [and] that he was certain that some of his coworkers and that his supervisors were treating him in a way he perceived to be racist." (Pl. Resp. to Def. SOF ¶ 25). Plaintiff's deposition does not support this. Plaintiff testified that he told Nicol at the July 2010 meeting that he felt Boundy was racist, but he also testified that he could not remember whether he told her that anyone else was racist. (Pl. Dep. 177:1-179:22). As such, Nicol's testimony that Plaintiff denied to her that he had told co-workers he felt the place was racist is not directly disputed in the record and I deem it admitted. Fed R. Civ. P. 56(e)(2). Nevertheless, I am troubled by the edits Nicol made to Paulson's PDR report to remove the reference that Plaintiff had complained to co-workers of racial harassment. (Def. Resp. to Pl. SOAF ¶¶ 105-109). In short, I do not credit her testimony that she removed the reference for Plaintiff's benefit. Had Plaintiff made out a stronger showing on the first three prongs of the *prima facie* showing, I would have, based on Nicol's conduct, found a genuine fact dispute as to employer liability and allowed this case to proceed to a jury.

Wermer acted with racial animus when he supposedly instructed employees to monitor the parking lot for Plaintiff's arrival. Along the same vein, the suggestion that Jon Bowlin acted with racial animus when he "got in [Plaintiff's] face" is significantly undermined by the fact that Plaintiff appears to have been inappropriately using an office printer for personal reasons during an especially busy work period.

Based on the totality of the circumstances, I find that Plaintiff has failed to make a *prima facie* showing of a hostile work environment. In short, his account of events is too vague, the events alleged are too sporadic in occurrence and low-severity in nature, and there is not enough objective evidence of a racial connection. Defendant's motion for summary judgment on Count I is GRANTED.

B. <u>Retaliation</u>

Defendant also moves for summary judgment on Plaintiff's claim that he was fired in retaliation for engaging in protected activity (complaining about racial harassment). Plaintiff has elected to proceed under the direct method of proof. (Pl. Resp. at 10). Under the direct method, Plaintiff must present evidence, direct or circumstantial, showing that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) a causal connection exists between the two. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 404 (7th Cir. 2007).

I am granting summary judgment to Defendant on this claim. The evidence is compelling that the decision to fire Plaintiff was made in mid to late April 2012 as a result of his tardiness on April 16—no reasonable jury could find that his May 1 email played a part in the decision to terminate him. Further, there is no direct evidence that Plaintiff's previous complaints about harassment played any role in the decision to fire him.

Plaintiff argues that the temporal proximity between his termination and his prior complaints of racial harassment, as well as "a pattern of retaliatory measures" make up a convincing mosaic of circumstantial evidence as to causation. I disagree. As far as I am able to discern from this record, Plaintiff's last (and only explicit) complaint of racial harassment prior to his termination was made to Nicol in July 2010—10 months prior to his termination. That is too distant in time to establish a causal connection. *See Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) (four months period between protected activity and adverse employment action is too long to establish a causal connection) (citing *Longstreet v. Ill. Dep't of Corr.*, 276 F.3d 379, 384 (7th Cir. 2002)). Finally, the so-called "retaliatory measures" are simply a rehashing of the alleged racial harassment in this case and alleged irregularities in Defendant's disciplinary procedures as applied to Plaintiff. Neither is strong enough to raise a genuine issue of material fact in the face of clear countervailing evidence that Plaintiff was terminated because of repeat tardiness and absenteeism.

Defendant's motion for summary judgment on Count II is GRANTED.

III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED.

ENTER:

James B. Zagel
United States District Judge

DATE: March 1, 2013

15